IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| LARRY JOHNSON, | ) | |
| | ) | No C 04-5169 JSW (PR) |
| Petitioner, | ) | |
| | ) | ORDER DENYING PETITION |
| vs. | ) | FOR A WRIT OF HABEAS |
| | ) | CORPUS |
| ROSEANNE CAMPBELL, Warden, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## **INTRODUCTION**

Petitioner Larry Johnson, a prisoner of the State of California, has filed *a pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This Court found that the petition, liberally construed, stated seven cognizable claims under § 2254 and ordered Respondent to show cause.  Respondent filed an answer to the petition and a memorandum of points and authorities and exhibits in support thereof.  Petitioner has not filed a traverse.  This order denies the petition for writ of habeas corpus on the merits.

## **PROCEDURAL BACKGROUND**

On October 19, 2000, the Alameda County District Attorney filed an information charging Petitioner with the murder of Lavonda Emery, Cal. Penal Code § 187.  On June 21, 2001, a jury found Petitioner guilty of second degree

murder and, on October 21, 2001, the trial court sentenced Petitioner to 15 years to life in state prison.

On May 27, 2003, the California Court of Appeal affirmed Petitioner's conviction and sentence.  The California Supreme Court denied review on August 27, 2003.  Petitioner filed his federal petition for writ of habeas corpus on November 24, 2004, in the Eastern District of California.  The petition was transferred to this Court on December 7, 2004.

## STATEMENT OF THE FACTS

The California Court of Appeal summarized the factual background of the case as follows:

Lavonda Emery was last known to be alive on November 4, 1998[1] in her Oakland apartment.  Her badly decomposed body was discovered a year and a half later on May 27, 2000, in a shallow grave in an isolated and remote vacant field in Sacramento. Defendant was arrested three days later at work in Sacramento.

Oakland police had suspected defendant virtually from the moment Ms. Emery's mother reported her missing on November 9. Two days after that report officers interviewed defendant at the police station. He told them that he had been dating Ms. Emery for about two years, and at one point they had lived together.  He last saw her on the afternoon of November 4.  They had an argument, followed by consensual sex. Defendant left in Ms. Emery's car (a red Dodge Neon) to go to work.  He returned the car (which he had washed) to appellant's apartment on the morning of November 5. He left a note for her on the windshield.  Discrepancies between defendant's statement and other information were deemed suspicious.  The following day, November 12, officers went to defendant's apartment and observed that most of the carpeting had been removed.

Defendant's Hayward apartment was searched (pursuant to a warrant) on November 13.  Police found traces of numerous large patches of human blood throughout the five-room apartment; the blood appeared diluted, as if an attempt had been made to wipe it away.  In the closet of defendant's bedroom police found a large knife with dried blood on the blade.  The knife also had defendant's fingerprint preserved in the blood.  Also found was a bloody t-shirt. The blood on the knife and the t-shirt did not come from defendant

---

[1] Dates mentioned are to the calendar year 1998 unless otherwise noted.

2

and most probably did come from the victim.  Of the blood samples collected off the walls, one was from defendant, one was from an unidentified woman, and the rest were most probably from the victim.

During this 1998 investigation police learned more of the relationship between defendant and the victim.  Shortly before she disappeared, defendant had "physically got her over his shoulders" and carried her out of her place of work, in front of coworkers; the victim described the incident as done by her "boyfriend," who "brought her problems everywhere she worked."  Joy Harris, an "exotic dancer" and friend of the victim, testified that in late September Ms. Emery stated that she wanted to leave defendant "because he was controlling and abusive and possessive over her," particularly about her earnings.  About this time Ms. Emery broke up with defendant and moved out of the apartment they had shared (this was the same apartment in Hayward searched by the police) and moved into an Oakland apartment with Joy Harris.

Thomas Riedl became friends with the victim shortly before she disappeared.  Emery told Riedl that defendant was "very controlling."  She was scared of defendant who was constantly calling her on a telephone number she had thought he did not know.  Defendant was "around all the time."  Riedl urged her to get a restraining order but she decided against it, thinking that defendant "will get over it."  At some point in mid-October Emery called Riedl in hysterics, telling him that she and defendant had just had a "fist fight."  On Halloween, Ms. Emery thought she had an appointment to have dinner with a man for $300.  The appointment turned out to be a "set up"-"the date was not there," but defendant was.  In early November the victim was talking to Riedl about changing her "lifestyle" and her "profession."  Riedl planned to meet Emery for dinner on November 4.  On the morning of the fourth Emery told Riedl that she was going to the Hayward apartment to retrieve a resume.  Emery was not worried about meeting defendant, because she thought he would be away at work.

The victim's mother, Karen Emery, corroborated much of Riedl's testimony.  She too recounted how her daughter was talking about changing her life and getting a different job.  She told of how her daughter regarded defendant as controlling and possessive, especially about her earnings.  The victim described defendant as "stalking" her.  Both Riedl and Ms. Emery testified that defendant wanted to have sex with the victim "for the last time."

The victim's roommate, Joy Harris, also testified that the victim thought defendant controlling of her company and her money.  Defendant's presence around the apartment was constant and unsettling-"he would come by, ... unexpected, like early in the morning, late at night and Lavonda didn't want nothing to do with him.  She didn't want him coming over there.  He was always hanging around our apartment...."  She corroborated the Halloween

3

"set up" described by Riedl.  She corroborated the victim's mother
that Lavonda thought defendant was "stalking" her.

*People v. Johnson*, 2003 WL 21224035, at 1-2 (Cal. Ct. App. May

27, 2003) (footnotes omitted).

      Further evidence was presented at trial indicating  that the victim died as a

result of criminal agency:

> Pertinent testimony was provided by three experts:
> Sacramento County Deputy Coroner Laura Santos, forensic
> anthropologist Dr. Alison Galloway, and pathologist Dr. Stephany
> Fiore.
>
>     Ms. Santos detailed why she concluded that this was a
> homicide: "Based on the totality of the circumstances, I felt that ... the
> fact that the body was concealed, buried in a grave in a site that was
> somewhat remote, not visible to the public, the fact that the body was
> not laid out in the grave but kind of limbs askew like she had been
> hastily placed in the grave, the fact that the grave was kind of uneven
> and shallow in some spots and deeper in other spots.  Another factor
> was the fact that there was no clothing on the bottom half of her body.
> She was clothed on the top half, but there [were] no shoes, ... pants or
> socks, no underwear on the bottom portion of the body.  Also based
> on the anthropology [*sic* ] findings and the findings of the
> pathologist."
>
>     Dr. Galloway testified that her examination of the remains
> disclosed multiple signs of trauma to the bones.  They included cut
> marks and "a sharp force trauma, which means that it was some sharp
> instrument that caused it" in the area of the eyes, a broken jaw, four
> broken ribs, and fractures of both hips, the sacrum, and left femur.
> Some of these could have occurred while the victim was alive or after
> her body had been placed in the grave.  Damage to the right knee
> could have been caused by a shovel or a rototiller being operated on
> the grave.  Dr. Galloway also noticed some "carnivorous activity" on
> the part of the left femur found outside the grave.  She thought it
> unlikely that the hip fracture occurred in the grave.
>
>     Dr. Fiore performed the autopsy.  She listed the cause of death
> as undetermined because "I did not feel that I had sufficient evidence
> to determine why she had died.  She did have some injuries, I wasn't
> sure whether those injuries had occurred in the grave or before she
> had died, or she could have died from other means that didn't leave
> any signs on the remains.  So I ... wasn't comfortable with calling a
> cause of death. [P] ... She could have been strangled, she could have
> been buried alive and left unconscious, she could have ... been
> stabbed to death.  But I couldn't tell."  She too thought it unlikely that
> all of the damage to the bones could have been caused while the body
> was in the grave.  Asked if the position of the remains was "consistent

with ... having been in the trunk of a compact car" (i.e., such as the victim's Neon), Dr. Fiore replied, "It would be consistent with being folded up into a small space." The cut marks on the skull could have been caused by the knife found in defendant's closet. Dr. Fiore agreed with Ms. Santos classifying the death as a homicide, giving as her reasons: "A young woman is buried in a clandestine grave approximately 120 miles from where she lives. So I would not have classified that death as a natural, unlikely that it was a suicide. People can't bury themselves after they're dead and accidental deaths usually don't get buried in clandestine graves."

*Id.* at 3-4 (footnotes omitted).

## STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under the 'contrary to' clause, a federal habeas court may grant the writ if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if a state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*,

5

529 U.S. at 413.  As summarized by the Ninth Circuit: "A state court's decision can involve an 'unreasonable application' of federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000) overruled on other grounds; *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003) (citing *Williams*, 529 U.S. at 405-07).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *accord Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must not only be erroneous, but objectively unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

In deciding whether a state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of the Petitioner's claim in a reasoned decision.  *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  Where the state court gives no reasoned explanation of its decision on a Petitioner's federal claim and there is no reasoned lower court decision on the claim, a federal habeas court should conduct an independent review of the record.  *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

The only definitive source of clearly established federal law under

6

28 U.S.C. § 2254(d) is in the holdings of the Supreme Court as of the time of the state court decision. *Williams* 529 U.S. at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). While the circuit law may be "persuasive authority" for the purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Id*.

This Court found that the habeas petition presented seven claims for relief: (1) he was deprived of due process because there was insufficient evidence showing that he proximately caused the victim's death or that he harbored malice; (2) he was deprived of due process and the right to a fair trial because the trial court did not respond properly to the jury's request for clarification on the legal concepts of malice aforethought and voluntary manslaughter; (3) he was deprived of due process and the right to a jury trial because the jury instructions on voluntary manslaughter created an impermissible presumption in favor of a murder verdict and were erroneous; (4) he was deprived of due process and the right to a jury trial because the trial court admitted hearsay statements attributed to the victim; (5) he was deprived of due process because the trial court failed to instruct the jury on the lesser offense of involuntary manslaughter; (6) he was deprived of due process, equal protection, and the right to a fair trial when the trial court improperly admitted evidence of prior domestic violence and (7) he was deprived of due process because the jury instructions that were given at trial misstated the burden of proof necessary for conviction.

<u>**DISCUSSION**</u>

**I.      <u>Insufficient Evidence</u>**

Petitioner claims that there was insufficient evidence adduced at trial to show that he proximately caused the victim's death or that he harbored malice, in violation of his right to due process.

The trial court instructed the jury on second degree murder, Cal. Penal Code § 187, and voluntary manslaughter, Cal. Penal Code § 192(a).  The court told the jury that, in order to prove second degree murder, it needed to  find, beyond a reasonable doubt, "[one], a human being was killed; two, the killing was unlawful and; three, the killing was done with malice aforethought."  RT 2722.  The court elaborated on the concept of malice aforethought:

> Malice may be either express or implied.  Malice is express where there is manifested an intention unlawfully to kill a human being.  Malice is implied when; one, the killing resulted from an intentional act; two, the natural consequences of the act are dangerous to human life and; three, the act was deliberately performed with knowledge of the danger to and with conscious disregard for human life.

> When it is shown that a killing resulted in the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought.

> The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed.

> The word "aforethought: does not imply deliberation or lapse of considerable time.  It only means that the required mental state must precede rather than follow the act.

*Id*. at 2722-23.  Following the court's instructions, the jury found Petitioner guilty of second degree murder.

When Petitioner challenged the sufficiency of evidence supporting his conviction as part of his appeal at the state level, the California Court of Appeal reviewed "the whole record in the light most favorable to the judgment to

8

determine whether it discloses substantial evidence-that is, evidence that is reasonable, credible, and of solid value-from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." *Johnson*, 2003 WL 21224035, at 5 (citing *Jackson v. Virginia*, 443 U.S. 307, 317-20 (1979)). Applying this standard (the "*Jackson*" standard), the California Court of Appeal rejected Petitioner's claim as follows:

> The prosecution introduced considerable evidence that the relationship between Ms. Emery and defendant was stormy, had recently broken up, and that defendant was unreconciled to the breakup. By his own admission to the police, he was the last person to see the victim alive, when she came to his apartment in Hayward. When that apartment was searched shortly thereafter, police discovered substantial quantities of blood which-the jury could conclude-belonged to the victim and were of recent origin and which defendant had attempted to conceal. From the victim's blood in the apartment, the blood on defendant's t-shirt, the victim's blood on the knife found in the apartment, the jury could conclude that a violent altercation occurred between defendant and the victim which resulted in the victim's death at defendant's hands. The jury could also conclude from the medical evidence recounted in part I, *ante,* that wounds found on the victim's remains were not product of accident, but of conscious and systematic intent, indicative of malice, and were inflicted by defendant, who enjoyed a pronounced physical advantage over the victim.

> Defendant went to high school in the Sacramento area, and at one point lived within several blocks of where the victim was buried. There was evidence that defendant attempted to doctor his employment records to show that he was at work on November 4, 1998, when in fact he was away from his job, thus providing him the opportunity to commit the crime. The jury could also believe that defendant was the last person to see Lavonda Emery alive. The jury could accept as evidence of guilt his admission that he drove the victim's car on November 4. They could conclude that he used it to transport her body, and attempted to remove incriminating proof by removing the trunk carpet and washing out the trunk. They could also conclude that he removed the carpet in his apartment because it was soaked with the victim's blood. With evidence connecting defendant to her last living moment and her place of burial, together with the blood in the apartment, the bloody t-shirt, and the bloody knife with his fingerprint preserved in the victim's blood, there is ample if not abundant substantial evidence from which the jury could conclude that defendant was the killer of Lavonda Emery.

*Id.* (footnotes omitted).

9

**A.     Legal Standard**

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson*, 443 U.S. at 321, which, if proven, entitles him to federal habeas relief, *see Id.* at 324.

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), cert. denied, 510 U.S. 843 (1993).  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *See id.* (quoting *Jackson*, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted.  *See Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338; *Miller v. Stagner*, 757 F.2d 988, 992-93 (9th Cir.), amended, 768 F.2d 1090 (9th Cir. 1985), cert. denied, 475 U.S. 1048, and cert. denied, 475 U.S. 1049 (1986); *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir.), cert. denied, 469 U.S. 838 (1984).

On habeas review, a federal court evaluating the evidence under *In re Winship* and *Jackson* should take into consideration all of the evidence presented at trial.  *LaMere v. Slaughter*, 458 F.3d 878, 882 (9th Cir. 2006) (in a case where both sides have presented evidence, a habeas court need not confine its analysis

to evidence presented by the state in its case-in-chief).  If confronted by a record

that supports conflicting inferences, a federal habeas court "must presume – even

if it does not affirmatively appear on the record – that the trier of fact resolved

any such conflicts in favor of the prosecution, and must defer to that resolution."

*Jackson*, 443 U.S. at 326.

Circumstantial evidence and inferences drawn from that evidence may be

sufficient to sustain a conviction.  *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir.

1995).  Mere suspicion and speculation cannot support logical inferences,

however.  *Id.*; *see, e.g., Juan H. v. Allen*, 408 F.3d 1262, 1278-79 (9th Cir. 2005)

(granting writ where, after resolving all conflicting factual inferences in favor of

prosecution, only speculation supported petitioner's conviction for first degree

murder under a theory of aiding and abetting).

After AEDPA, a federal habeas court applies the standards of *Jackson*

with an additional layer of deference.  *Juan H.*, 408 F.3d at 1274.  Generally, a

federal habeas court must ask whether the operative state court decision reflected

an unreasonable application of *Jackson* and *Winship* to the facts of the case.  *Id.*

at 1275 (quoting 28 U.S.C. § 2254(d)).[2]  Section 2254(d)(1) plainly applies to

*Jackson* cases; that is, if the state court affirms a conviction under *Jackson*, the

federal court must decide whether the state court's application of *Jackson* was

objectively unreasonable.  *Sarausad v. Porter*, 479 F.3d 671, 677-78  (9th Cir.

─────────────────────────

[2] Prior to *Juan H.*, the Ninth Circuit had expressly left open the question of whether 28 U.S.C. § 2254(d) requires an additional degree of deference to a state court's resolution of sufficiency of the evidence claims.  *See Chein v. Shumsky*, 373 F.3d 978, 982-83 (9th Cir.2004) (en banc); *Bruce*, 376 F.3d at 956-57.  But in *Juan H.*, the court concluded that "the Supreme Court's analysis in *Williams* compels the conclusion that the state court's application of the *Jackson* standard must be "'objectively unreasonable.'"  *Juan H.*, 408 F.3d at 1275 n.13 (quoting *Williams v. Taylor*, 529 U.S. at  409.

2007). By contrast, § 2254(d)(2) is not readily applicable to *Jackson* cases, because a court under *Jackson* makes no "determination of the facts" in the ordinary sense of resolving factual disputes. *Id.* at 678. Rather, the court views the evidence in the light most favorable to the prosecution without resolving any disputed factual questions. *Id.* The federal court's task is not to decide whether the state court unreasonably determined disputed facts; it is, rather, to decide whether the state court unreasonably applied the *Jackson* test. *Id.*; *see id.* at 683 (finding that while state court's characterization of certain testimony was objectively unreasonable, its conclusion that the *Jackson* standard was satisfied was not objectively unreasonable). Thus, a federal court evaluates a state court's resolution of a *Jackson* sufficiency of the evidence claim in all cases under § 2254(d)(1) rather than § 2254(d)(2). *Id.* at 2561-62.[3]

### B.    Analysis

The California Court of Appeal's rejection of Petitioner's claim that there was insufficient evidence adduced at trial showing that Petitioner proximately caused the victim's death and that he harbored malice, in violation of Petitioner's right to due process, was not contrary to, or an unreasonable application of,

---

[3] The Ninth Circuit has adopted guidelines for applying the "objective unreasonableness" test under § 2254(d)(1) to a state court decision applying *Jackson*: (1) the focus of the inquiry is on the state court decision; (2) even with the deference due by statute to the state court's determinations, the federal habeas court must look to the "totality of the evidence" in evaluating the state court's decision; (3) the failure of the state court to consider at all a key argument of the defendant may indicate that its conclusion is objectively unreasonable; however, the paucity of reasoning employed by the state court does not itself establish that its result is objectively unreasonable; (4) the failure of a state court to give appropriate weight to all of the evidence may mean that its conclusion is objectively unreasonable; and (5) the absence of cases of conviction precisely parallel on their facts does not, by itself, establish objective unreasonableness. *Sarausad*, 479 F.3d at 678.

clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

The California Court of Appeal's application of *Jackson* was not objectively unreasonable.  The appellate court looked at the totality of evidence presented at trial and concluded that a rational trier of fact could have found beyond a reasonable doubt that Petitioner was guilty of second degree murder. The appellate court identified an ample amount of evidence of causation presented at trial implicating Petitioner in the murder of the victim, from his history of domestic abuse, to his fingerprint in the victim's blood on a knife discovered in his own home.  The appellate court also highlighted evidence of malice in the expert testimony presented at trial which supported the theory that the wounds over the victim's body were the product of a systematic intent. Although much of the evidence surrounding causation and malice was circumstantial, the evidence was abundant and went far beyond "mere suspicion and speculation" in supporting the logical inference that Petitioner murdered the victim.  *Walters*, 45 F.3d at 1358; *see, e.g., Juan H.*, 408 F.3d at 1278-79.

Petitioner has not identified, nor does the record reveal, any defects in the appellate court's application of *Jackson* that might be considered objectively unreasonable under *Sarausad*.  Petitioner makes an analogous argument when he asserts that the California Court of Appeal failed to consider or give appropriate weight to his self-proclaimed efforts to find the victim after she was reported missing, to the "deficient" quality of the police investigation, and to the evidence of Petitioner's "good character."  Pet. at 3-4; *See Sarausad* factors (2), (3), and (4) *(Sarausad*, 479 F.3d at 678).  But given the state court's task to determine whether a rational trier of fact could have found proof of guilt beyond a reasonable doubt given the evidence supporting the verdict, the failure of the

13

appellate court to discuss or give much weight to the evidence that Petitioner identifies does not undermine its decision, particularly in light of the strong circumstantial evidence implicating Petitioner in the victim's murder.

Petitioner is not entitled to federal habeas relief on his insufficient evidence claim  because the California Court of Appeal's rejection of the claim was not contrary to, or involved an unreasonable determination of, clearly established Supreme Court precedent.  *See* 28 U.S.C. § 2254(d).

## II.   **Failure to Respond to the Jury's Request for Clarification**

Petitioner claims that the trial court violated his due process rights when it failed to adequately respond to the jury's request for clarification on the legal concepts of malice aforethought and voluntary manslaughter.  The California Court of Appeal provided the following background for Petitioner's claim:

> Several hours after it began deliberating, the jury sent the court a note requesting "further clarification of the definition of malice of forethought [sic] and voluntary manslaughter."  In the presence of counsel for both sides, the court told the jury: "All I can tell you is that you have received the legal definitions that you have to work through.  Without being more specific about what needs clarification, I don't frankly understand the question.  I think what you're going to do-I don't know how long you've been discussing or going-how long you've been going over these particular instructions, and I don't want to know, and I don't know how long you've been working on the facts and how the instructions and the facts are going through your deliberations, but I think what you're going to have to do is exchange ideas on what these instructions mean and how they apply to the facts of the case.
>
> If you can be more specific about something that you're not able to come to agreement about, if you can be more specific, I will try to help you. But the question itself is vague enough to where I'm not sure I know what it is that you're hung up on.  I don't want to hear any discussion out here about it, I want you to go back in the jury [room], talk about it among yourselves, perhaps more talk is necessary and more work needs to be done with the definition you've already been given before we get to the point of other questions.
>
> I'll leave that up to you, okay?  So I don't have an answer for you because I don't understand where your struggling with the definition.  So I'm going to send you back to work on it....

14

If I can help you, if you can [be] a little bit more precise about what you need, I will try."  After the jury left the room, the court asked counsel "Any problems with what was said?"  Both counsel replied "No."

*Johnson*, 2003 WL 21224035, at 18.

The next day, the jury requested that the court reread the testimony of Eva Jean, which referenced prior incidents of domestic abuse involving herself and Petitioner,  as well as her interactions with Petitioner following the victim's death. RT 2746.  The jury also requested that the court replay two audiotapes, one of the victim's December 31, 1997, "hang up call" to the police, in connection with a domestic disturbance involving the victim and Petitioner, and another of Petitioner's interview with police following the victim's disappearance.  *Id*. Notably, the jury did not request any further clarification on the concepts of malice aforethought and voluntary manslaughter.  The following day, the jury found Petitioner guilty of second degree murder.  *Id*. at 2749.

Petitioner argues that the trial court's response to the jury's inquiry was inadequate, in violation of his right to due process.   Petitioner contends that the court, at a minimum, "should have made further inquiries" into the jury's confusion in order to better help the jury understand the relevant concepts.  Pet. at 30.

The California Court of Appeal rejected Petitioner's claim.  The court found that the instructions given were "full and complete."  *Johnson*, 2003 WL 21224035, at 18.  The court noted that the jury's desire for "further clarification" was too general and that, given the opportunity to clarify its desire for more specific assistance regarding malice aforethought and voluntary manslaughter, the jury declined to do so, indicating that it  resolved any difficulties in interpreting the relevant concepts and that it arrived at a verdict based on the instructions as they were given.  *Id*.

15

**A.     Legal Standard**

A habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776 (1946)).  In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." *Id.*

"When a jury makes explicit its difficulties, a trial judge should clear them away with concrete accuracy." *Bollenbach v. United States,* 326 U.S. 607, 612-13 (1946).  The trial judge has a duty to respond to the jury's request for clarification with sufficient specificity to eliminate the jury's confusion.  *See Beardslee v. Woodford*, 358 F.3d 560, 574-75 (9th Cir. 2004) (harmless due process violation occurred when, in responding to request for clarification, court refused to give clarification and informed jury that no clarifying instructions would be given); *United States v. Frega,* 179 F.3d 793, 808-11.  (9th Cir. 1999) (trial judge's confusing response to jury's questions raised possibility that verdict was based on conduct legally inadequate to support conviction); *McDowell v. Calderon*, 130 F.3d 833, 839 (9th Cir. 1997) (same in state capital case).

However, the trial judge has wide discretion in charging the jury, a discretion which carries over to the judge's response to a question from the jury.  *Arizona v. Johnson*, 351 F.3d 988, 994 (9th Cir. 2003).  Also, just as a jury is presumed to follow its instructions, it is presumed to understand a judge's answer to a question.  *Weeks v. Angelone,* 528 U.S. 225, 234 (2000).

**B.     Analysis**

The California Court of Appeal's rejection of Petitioner's claim that the

trial court violated his due process rights when it failed to adequately respond to the jury's request for clarification on the legal concepts of malice aforethought and voluntary manslaughter was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

The trial court originally instructed the jury with versions of CALJIC No. 8.11, which defines malice aforethought, and CALJIC No. 8.40, which defines voluntary manslaughter. It is presumed that the jury followed these instructions. *See Angelone*, 528 U.S. at 234. It is further presumed that the jury understood the court's response to its request for clarification on the concepts of malice aforethought and voluntary manslaughter, specifically, that the jury understood that it needed to be "a little bit more precise" about its needs if it desired the court's assistance. *Johnson*, 2003 WL 21224035, at 18. There was nothing constitutionally infirm in the trial court's request of the jury that they make more explicit the nature of the difficulties they had with the given instructions. *See, e.g., Bollenbach,* 326 U.S. at 612-13. That the jury returned the next day and made specific requests of the court regarding the rereading of testimony and replaying of tapes, but did not make any additional requests related to the clarification of these concepts, suggests that the jury resolved any outstanding difficulties in interpreting CALJIC Nos. 8.11 and 8.40.

Petitioner is not entitled to federal habeas relief on his claim that the trial court responded improperly to the jury's inquiry regarding the legal concepts of malice aforethought and voluntary manslaughter because the California Court of Appeal's rejection of the claim was not contrary to, or involved an unreasonable determination of, clearly established Supreme Court precedent, or involved an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

17

**III.    Erroneous Jury Instructions on Voluntary Manslaughter**

Petitioner claims that the trial court violated his due process rights because the jury instructions on voluntary manslaughter were erroneous and created an impermissible presumption in favor of a murder verdict.  The California Court of Appeal rejected Petitioner's claim.

**A.    Legal Standard**

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  *See Estelle v. McGuire,* 502 U.S. 62, 71-72 (1991).  Nor does the fact that a jury instruction was inadequate by Ninth Circuit direct appeal standards mean that a petitioner who relies on such an inadequacy will be entitled to habeas corpus relief from a state court conviction.  *See Duckett v. Godinez*, 67 F.3d 734, 744 (9th Cir. 1995) (citing *Estelle*, 502 U.S. at 71-72), *cert. denied*, 517 U.S. 1158 (1996).

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  *See Estelle*, 502 U.S. at 72; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").

The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  *See Estelle*, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe,* 431 U.S. 145, 154 (1977)); *Prantil v. California*, 843 F.2d 314, 317 (9th

Cir.), *cert. denied*, 488 U.S. 861 (1988); *see e.g.*, *Middleton*, 541 U.S. at 434-35 (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law); *Mayfield v. Woodford*, 270 F.3d 915, 922-24 (9th Cir. 2001) (no error where court allowed the jury to consider "such guilt phase instructions as it found applicable" for the penalty phase (raising concerns that they would rely on instructions precluding consideration of mitigating factors) because when viewed as a whole the instructions required the jurors to consider all relevant mitigating evidence for the penalty phase); *cf. Lankford v. Arave*, 468 F.3d 578, 585-87 (9th Cir. 2006) (additional, proper instructions did not cure incorrect accomplice testimony instructions where conscientious jury might read instructions in a way that permitted conviction on alternative legal theories, one of which was legally incorrect, and verdict hinged on accomplice's testimony).  The defined category of infractions that violate fundamental fairness is very narrow: "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."  *Estelle*, 502 U.S. at 73.

In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution.  *See id.* at 72 & n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990); *see, e.g., Ficklin v. Hatcher*, 177 F.3d 1147, 1150-51 (9th Cir. 1999) (harmless error when certain that jury did not rely on constitutionally infirm instruction).  A determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred, however.  *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998).  If an error is found, the

court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, *see Brecht*, 507 U.S. at 637 (1993), before granting relief in habeas proceedings. *See Calderon*, 525 U.S. at 146-47; *see, e.g.*, *Sarausad*, 479 F.3d at 679 (finding reasonable likelihood that jury applied ambiguous instruction on accomplice liability to find defendant guilty of murder in a way that relieved the State of its burden of proof, and that this error was not harmless).

If the disputed instruction is erroneous on its face, the "reasonable likelihood" standard employed for ambiguous jury instructions is not required. *Ho v. Carey*, 332 F.3d 587, 592 (9th Cir. 2003).  If a jury instruction omits a necessary element of the crime, for example, constitutional error has occurred. *Id*.; *see also id*. at 593 (finding jury instructions "erroneous" rather than ambiguous, where they included an uncorrected erroneous instruction that second-degree murder could be based on a finding of general intent, but also included an accurate description of the elements of second-degree murder, including specific intent).  Actual prejudice is still required before relief may be granted, however.  *See id*. at 595 (citing *Brecht*, 507 U.S. at 637).

## B.    Analysis

The California Court of Appeal's rejection of Petitioner's claim that the trial court violated his due process rights because the jury instructions on voluntary manslaughter created an impermissible presumption in favor of a murder verdict and were erroneous was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d).

### 1.    Creation of an Impermissible Presumption in Favor of a Murder Verdict

The trial court instructed the jury with  CALJIC Nos. 8.42 and 8.43 as

1   follows:

2         To reduce an unlawful killing from the offense of murder to manslaughter, upon the ground of sudden quarrel or heat of passion,
3   the provocation must be of the character and degree as naturally would excite and arouse the passion and the assailant must act under
4   the influence of that sudden quarrel or heat of passion.

5         The heat of passion which will reduce a homicide to manslaughter must be such passion as naturally would be aroused in
6   the mind of an ordinarily reasonable person in the same circumstances.

7
      A defendant is not permitted to set up his own standard of
8   conduct and to justify or excuse himself because his passions were aroused, unless the circumstances in which the defendant was
9   placed and the facts that confronted him, were such as also would have aroused the passions of the ordinarily reasonable person faced
10   with the same situation.

11         Legally adequate provocation may occur in a short or over a considerable period of time.  The question to be answered is
12   whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would
13   cause the ordinarily reasonable person of average disposition to act rationally [sic] and without deliberation and reflection and from
14   passion rather than from judgment.

15         If there was provocation, whether of short or long duration but of a nature not normally sufficient to arouse passion, or if
16   sufficient time elapsed between the provocation and the fatal blow for passion to subside and return, and if an unlawful killing of a
17   human being followed the provocation and had all the elements of murder as I have defined it, the mere fact of slight or remote
18   provocation will not reduce the offense to manslaughter.

19         To reduce a killing, upon a sudden quarrel or heat of passion, from murder to voluntary manslaughter, the killing must have
20   occurred while the slayer was acting under the direct and immediate influence of the quarrel or heat of passion.  Where the influence of
21   the sudden quarrel or heat of passion has ceased to obscure the mind of the accused and sufficient time has elapsed for angry passion to
22   end and for reason to control his conduct, it will no longer excuse express or implied malice and reduce the  killing to voluntary
23   manslaughter.  The question, as to whether the cooling period has elapsed and reason has returned, is not measured by the standard of
24   the accused but the duration of the cooling period is the time it would take the average or ordinarily reasonable person to have
25   cooled the passion and for that person's reason to have returned.

26   RT 2723-2725.  Petitioner argues that these instructions, as given, contained

27

28   21

"frequent references to the idea that a manslaughter verdict requires a reduction of the homicide from murder," which, in turn, "intrude[d] into the deliberative process and create[d] an improper presumption that homicide is murder rather than manslaughter." Pet. at 35. Petitioner further argues that CALJIC Nos. 8.42 and 8.43 "lightened" the prosecution's burden of proof, in violation of his due process rights. *Id*. at 37.

The California Court of Appeal rejected Petitioner's claim, holding that "[t]he language of which defendant now complains has been approved by our Supreme Court virtually since California became a state" and that "[i]f the language is found to be defective, it is not for this court to do the finding." *Johnson*, 2003 WL 21224035, at 12.

The Due Process Clause of the Fourteenth Amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he or she is charged. *In re Winship*, 397 U.S. 358, 364 (1970). This constitutional principle prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime. *See Yates v. Evatt*, 500 U.S. 391, 400-03 (1991); *Carella v. California*, 491 U.S. 263, 265-66 (1989); *Francis v. Franklin*, 471 U.S. 307, 313 (1985); *Sandstrom v. Montana*, 442 U.S. 510, 520-24 (1979).

The state court's rejection of Petitioner's claim was not contrary to federal law. Petitioner is correct that CALJIC Nos. 8.42 and 8.43 reference the legal principle that a manslaughter verdict requires a reduction of homicide from murder. It does not follow, however, that these instructions created any "improper presumptions" or that they "lightened" the prosecution's burden of proof in such a way as to give rise to a due process violation. Rather, CALJIC

22

Nos. 8.42 and 8.43 accurately state the law, which includes the principle that the reduction of a homicide from murder to manslaughter hinges on the absence or presence of malice aforethought.  Petitioner has not established that the use of these instructions lessened the burden of proof.

Reading CALJIC Nos. 8.42 and 8.43 "in the context of the instructions as a whole" reinforces the appellate court's finding that these instructions created no improper presumption of guilt.  *See Estelle*, 502 U.S. at 72.  Aside from CALJIC Nos. 8.42 and 8.43, the court instructed the jury with additional CALJIC instructions which made explicit the burden on the prosecution.  CALJIC No. 8.50, for instance, was read to include the following: "To establish that a killing is murder and not manslaughter, the burden is on the People to prove beyond a reasonable doubt each of the elements of murder and that the act which caused the death was not done in the heat of passion or upon a sudden quarrel."  RT 2725-26. The jury was also instructed with CALJIC No. 8.72, which provides: "If you are convinced beyond a reasonable doubt and unanimously agree that the killing was unlawful, but you unanimously agree that you have a reasonable doubt whether the crime is murder or manslaughter, you must give the defendant the benefit of that doubt and find it to be manslaughter rather than murder."  *Id*. at 2726-28.  If the burden on the prosecution was in any way vague upon the issuance of CALJIC Nos. 8.42 and 8.43, these additional instructions clarified the prosecution's burden.

Petitioner is not entitled to federal habeas relief on his claim that the trial court created an impermissible presumption in favor of a murder verdict  because the California Court of Appeal's rejection of the claim was not contrary to, or involved an unreasonable determination of, clearly established Supreme Court precedent.  *See* 28 U.S.C. § 2254(d).

23

1

**2.       Issuance of Erroneous Instructions**

2          Prior to 2001, intent to kill was required for a conviction of voluntary

3   manslaughter.  Following *People v. Blakely*, 23 Cal.4th 82, 96 (2000) and *People*

4   *v. Lasko*, 23 Cal.4th 101, 96 (2000), CALJIC No. 8.40 was revised to expand the

5   definition of voluntary manslaughter such that one could commit the offense

6   "either with an intent to kill, or with conscious disregard for human life."

7   CALJIC No. 8.40.

8          When discussing jury instructions, the trial court indicated that it would

9   issue the 2001 revised version of CALJIC No. 8.40.  RT 2529. When the court

10  orally instructed the jury on voluntary manslaughter, however, it erred by

11  omitting reference to "conscious disregard for human life" in the opening

12  paragraph of the instruction.  The court orally instructed the jury on CALJIC No.

13  8.40 as follows:

14          The crime of manslaughter is the unlawful killing of a human
            being without malice aforethought. Voluntary manslaughter, a
15          violation of section 192(a) of the Penal Code, is a lesser crime ... of
            second degree murder. Every person who unlawfully kills another
16          human being without malice aforethought, but with an intent to kill,
            is guilty of voluntary manslaughter in violation of Penal Code
17          section 192(a). There is no malice aforethought if the killing
            occurred upon a sudden quarrel or heat of passion.

18
19  RT 2723.  The court proceeded to immediately thereafter complete the instruction

20  of CALJIC No. 8.40 with the appropriate post-2001 revision language:

21          Conscious disregard for life, as used in this instruction, means
            that a killing results from the doing of an intentional act, the natural
22          consequences of which are dangerous to life, which act was
            deliberately performed by a person who knows that his conduct
23          endangers the life of another and who acts with conscious disregard
            for life.

24          In order to prove this crime, each of the following elements
            must be proved: One, a human being was killed; two, the killing was
25          unlawful and; three, the perpetrator of the killing either intended to kill
            the alleged victim *or acted in conscious disregard for life* and; four,
26          the perpetrator's conduct resulted in the unlawful killing.

27

28                                           24

*Id.* (emphasis added.)  The written instructions that were given to the jury contained the same error in the first paragraph of the instruction.  CT 1181.

Although the court properly incorporated the "conscious disregard for human life" language from the 2001 revision in the latter portion of the instruction, Petitioner argues that he was nonetheless deprived of due process because "the jury could have thought that they could find [Petitioner] guilty of voluntary manslaughter only if they found that he harbored an intent to kill" based on the initial omission. Pet. at 15.

The California Court of Appeal rejected Petitioner's claim.  The court held that, while it was error "in the wake of *Blakely* and *Lasko*, to instruct a jury that a conviction for voluntary manslaughter invariably requires proof of an intent to kill . . . the situation was largely dissipated when the jury was then told that one of the elements required for conviction was that 'the perpetrator of the killing either intended to kill the alleged victim or acted in conscious disregard for life.'" *Johnson*, 2003 WL 21224035, at 13.  The court noted that the initial error of omission  was further mitigated by the trial court's defining of "conscious disregard for life" as part of the instruction, which "accurately informed the jury that conviction for voluntary manslaughter did not depend on finding that defendant had an 'intent to kill.'" *Id*.  Additionally, the court found that the prosecution did not "exploit the potential confusion in CALJIC No. 8.40 " that Petitioner identifies.  *Id*. at 14.  In light of "all the evidence," the court concluded that "the error was harmless." *Id*. at 15.

Petitioner now argues that the California Court of Appeal's rejection of his erroneous instruction claim was incorrect because "it is not reasonable for a jury to be expected to ferret out accurate and inaccurate parts of an instruction, particularly an instruction that describes the elements of an offense."  Pet. at 15.

Petitioner argues that CALJIC No. 8.40, as was given to the jury, was an erroneous instruction. However, the instruction, as it was given, contained all of the elements of voluntary manslaughter pursuant to the 2001 revisions. The fact that the "conscious disregard for life" language was omitted from the first part of the instruction did not render the instruction erroneous insofar as it was included in the discussion of the elements of the crime and there were no false statements of the law in the instruction. *See Ho*, 332 F.3d at 592.

The trial court's error in failing to issue the revised jury instruction in its entirety may at most have rendered the jury instruction ambiguous, in which case the relevant inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the Constitution. *See Estelle*, 502 U.S. at 7; *Boyde*, 494 U.S. at 380 (1990). Despite the trial court's error of initially omitting the 'conscious disregard' language, it ultimately instructed the jury that in order to prove voluntary manslaughter, the prosecution had to prove that "the perpetrator of the killing either intended to kill the alleged victim or acted in conscious disregard for life." RT 2723. As the state court noted, the jury had all elements of the crime before it with the given instruction and prosecution did not try to exploit any ambiguity in the trial court's error. It cannot be said that there is a reasonable likelihood that the jury applied this instruction in a way that violated Petitioner's constitutional rights.

Even if Petitioner were able to show that there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the Constitution, his claim would still fail because Petitioner would not be able to establish prejudice. *See Brecht*, 507 U.S. at 637 (1993). Under *Brecht*, Petitioner must show that any error had a substantial and injurious effect or influence in determining the jury's verdict. *Id. See also Coleman v. Calderon*, 210 F.3d 1047, 1051 (9th Cir. 2000)

(finding *Brecht* prejudice where "at the very least" the court could not "'say with fair assurance . . . that the judgment was not substantially swayed by the [instructional] error.'")   Given the ample evidence that Petitioner acted with malice aforethought presented at trial, including the evidence regarding the relationship between the victim and Petitioner, the testimony of forensic experts who indicated that criminal agency played a role in the victim's murder, it is clear that the judgment was not "substantially swayed" by instructional error.  *See Coleman*, 210 F.3d 1051.

Petitioner is not entitled to federal habeas relief on his claim that the jury instructions on voluntary manslaughter were erroneous because the California Court of Appeal's rejection of the claim was not contrary to, or involved an unreasonable determination of, clearly established Supreme Court precedent.  *See* 28 U.S.C. § 2254(d).

## IV.   Admission of Hearsay Statements

Petitioner claims that he was deprived of his Sixth Amendment right to confrontation, the right to due process, and the right to a fair trial because the trial court improperly admitted 15 hearsay statements attributed to the victim.  Petitioner identifies the statements as follows:

> 1) From Isabel Perry, that Emery said that her boyfriend suddenly walked into the Casbah Club, got her over his shoulders, and carried her out of the club.  She also said that her boyfriend caused her problems at other clubs.
>
> 2) From Joy Harris, that Emery said that she wanted to leave Petitioner because he was controlling and possessive.
>
> 3) From Joy Harris, that Emery said that Petitioner did not want her to go out.
>
> 4) From Joy Harris, that Emery said that Petitioner took some of her money.
>
> 5) From Joy Harris, that Emery said that Petitioner told her he had a date set up for her to go to dinner with some guy for $300 on Halloween night.  However, when she went to his house to meet this guy, only Petitioner was there.  He had been trying to get back with

her.

6) From Joy Harris, that Emery said that Petitioner was stalking her.

7) From Thomas Riedl, that Emery said that she broke up with Petitioner because he was very controlling.

8) From Thomas Riedl, that Emery said that Petitioner told her that he wanted to have sex with her one more time.

9) From Thomas Riedl, that Emery said, "It's Larry's car out there," referring to appellant's car in the street outside the Jackson Street apartment.

10) From Thomas Riedl, that Emery said that, "Larry will get over it and he will be fine," in response to Riedl's suggestions that she get a restraining order.

11) From Thomas Riedl, that Emery said that Petitioner called her and said that he had set up a date for her to get paid $300 to go to dinner with someone on Halloween.  However, it had been a setup by Petitioner to be with her.

12) From Thomas Riedl, that Emery said that Petitioner would not be at his home in Hayward when she went there to get her resume.

13) From Karen Emery, that Emery said that Petitioner wanted to control the money and kept it in the trunk of his car.

14) From Karen Emery, that Emery said that she moved into the apartment in Oakland because Petitioner had become possessive and controlling and she just wanted to be away from him.

15) From Karen Emery, that Emery said that there were occasions when she came home to the Oakland apartment that Petitioner would be across the street watching her.  Once she went over to his car, and he asked her for sex for the last time.

Pet. at 16-17.

The California Court of Appeal rejected Petitioner's claim that the trial court improperly admitted these statements.  The court explained:

> The relevant law was explained in *People v. Noguera* (1992) 4 Cal.4th 599, 15 Cal.Rptr.2d 400, 842 P.2d 1160: "In *People v. Ruiz* (1988) 44 Cal.3d 589, 244 Cal.Rptr. 200, 749 P.2d 854, ... we held that the trial court's admission of the hearsay testimony of three murder victims expressing their fear of the defendant was error because 'neither the states of mind of these victims prior to their deaths ... nor their acts or conduct ... were an issue in the case which might have been resolved or assisted by the challenged evidence.'" [Citation.] 'As

28

our cases have made clear,' we said, '"a victim's out-of-court statements of fear of an accused are admissible under [Evidence Code] section 1250 only when the victim's conduct in conformity with that fear is in dispute. Absent such dispute, the statements are irrelevant." [Citations omitted.]

We went on to observe ... that 'a victim's prior statements of fear are not admissible to prove the defendant's conduct or motive (state of mind). If the rule were otherwise, such statements of prior fear or friction could be routinely admitted to show that the defendant had a motive to injure or kill.' [Citation omitted.]

Thus, hearsay statements of victims concerning fears or threats against them by the accused, when offered to prove the conduct of the accused, are not within the exception to the hearsay rule embodied in Evidence Code section 1250. Here, neither Jovita's state of mind nor her conduct was relevant to any part of the People's case; nor did the defense raise any issue concerning her state of mind or behavior at or before the night she was murdered. The entire thrust of the defense case went to the identity of the killer and defendant's alibi that he was attending a party miles away from the crime scene....

Jovita's state of mind or conduct not being an issue in either the prosecution or defense case, her hearsay statements reflecting dislike and fear of defendant failed to satisfy the requirement that the declarant's 'state of mind, emotion, or physical sensation ... [be] itself an issue in the action.' (Evid.Code, § 1250, subd. (a)(1).) It was thus error for the trial court to admit them into evidence." (*People v. Noguera*, *supra*, 4 Cal.4th 599, 621-622, 15 Cal.Rptr.2d 400, 842 P.2d 1160.).

*Noguera* is inapposite here, however, because defendant's statement to police put into issue the victim's state of mind. The evidence was particularly relevant to rebutting the substance of defendant's November 11, 1998, statement, specifically that (1) the victim willingly came to his apartment, expecting defendant to be there, in order that she could pick up some money that defendant owed her and her uncle and be picked up at defendant's apartment by an "escort" and, (2) he visited the victim at her new apartment in Oakland because she had given him a blanket invitation. The statements concerning Ms. Emery's state of mind were relevant to whether she would act in conformity with her oft-expressed fears, i.e., whether it was at all likely that she would go to defendant's apartment if there was any chance of meeting defendant. The statements were not offered for the truth of their hearsay content, nor were they offered to prove conduct by defendant.

Moreover, defendant's counsel put the victim's state of mind at issue with these remarks in his opening statement at the start of the trial: "You're going to hear evidence in this case that Lavonda Emery and Larry Johnson lived together. You're going to hear evidence in this case that Larry Johnson and Lavonda Emery had a romantic

relationship ... that that relationship ended two to three weeks [ ] before Miss Emery's disappearance. That Miss Emery moved in with Joy Harris. [P] You're going to hear evidence that Larry Johnson continued to have a relationship with Miss Emery; that relationship was both friendly, financial and business-like."

The decision whether to admit state-of-mind evidence was committed to the trial court's discretion. (*People v. Escobar* (2000) 82 Cal.App.4th 1085, 1103, 98 Cal.Rptr.2d 696.) That discretion clearly was not abused here.

*Johnson*, 2003 WL 21224035, at 8-9 (footnotes omitted).

Petitioner argues that the California Court of Appeal's rejection of his claim was based on "overbroad reasoning." Pet. at 17. He posits that the prosecution introduced many of the statements in question to prove his conduct, not the victim's state of mind, "which is an impermissible purpose under the Evidence Code section 1250 hearsay exception." *Id*.

## A.   Legal Standard

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), *cert. denied*, 479 U.S. 839 (1986). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *See Henry*, 197 F.3d at 1031; *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).

While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness. *See id.* (citing *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983), *cert. denied*, 469 U.S. 838 (1984)). The due process inquiry in federal habeas review is whether the

30

admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *See Walters*, 45 F.3d at 1357 (9th Cir. 1995); *Colley*, 784 F.2d at 990. But only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. *See Jammal*, 926 F.2d at 920.

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him." U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. *See Pointer v. Texas*, 380 U.S. 400, 403 (1965). It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. *Crawford v. Washington*, 541 U.S. 36, 61 (2004); *see Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (a primary interest secured by the Confrontation Clause is the right of cross-examination).

The Confrontation Clause applies to all "testimonial" statements. *See Crawford*, 541 U.S. at 50-51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51 (citations and quotation marks omitted); *see id.* ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). The Confrontation Clause applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of the admissibility of the statements under state laws of evidence. *Crawford*, 541 U.S. at 50-51.[4]

In *Ohio v. Roberts*, 448 U.S. 56, 65 (1980), the Supreme Court established a

---

[4]*Crawford,* decided after Petitioner's case became final, does not apply retroactively to his case on collateral attack. *Whorton v. Bockting*, 127 S. Ct. 1173, 1184 (2007).

two-pronged test to determine whether admission of an out-of-court declarant's statement violates the Confrontation Clause.  First, a showing must be made that the declarant is "unavailable."  *Roberts*, 448 U.S. 65; *Terrovona v. Kincheloe*, 852 F.2d 424, 427 (9th Cir. 1988) (admission of dead witness' statement not violation of Confrontation Clause where testimony of girlfriend of dead witness placed petitioner at scene of crime and met indicia of reliability); *Barker v. Morris*, 761 F.2d 1396 (9th Cir. 1985) (admission of sworn videotaped testimony by dead eyewitness not violation of Confrontation Clause due to necessity for testimony and particular guarantees of trustworthiness).

Second, the statement is admissible only if it bears adequate "indicia of reliability." *Roberts*, 488 U.S. at 57.  .  Otherwise, the evidence may not be admitted absent a showing of "particularized guarantees of trustworthiness."  *Id*. at 66. Reliability may be established solely by a showing that the evidence falls within a firmly rooted hearsay exception.  *Id*.

Out-of-court statements constitute hearsay when offered in evidence to prove the truth of the matter asserted. *Anderson v. United States*, 417 U.S. 211, 219 (1974). While the Confrontation Clause does not necessarily bar the admission of hearsay statements, it may prohibit introducing evidence that otherwise would be admissible under a hearsay exception. *See Idaho v. Wright*, 497 U.S. 805, 813, 814 (1990); *see, e.g.*, *Lilly v. Virginia*, 527 U.S. 116, 139-40 (1999) (plurality) (admission of accomplice's hearsay confession to police inculpating defendant violated Confrontation Clause); *id*. at 143 (Scalia, J., concurring) (same).

### B.    Analysis

The California Court of Appeal's rejection of Petitioner's claim that the trial court violated his due process rights when it admitted hearsay statements attributed to the victim was not contrary to, or involved an unreasonable application of, clearly

32

established Supreme Court precedent, or was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

### 1.    Violation of Rights to Due Process and a Fair Trial

The trial court's admission of the hearsay statements in question was not arbitrary or prejudicial such that it rendered the trial fundamentally unfair. *See Walters*, 45 F.3d at 1357 (9th Cir. 1995); *Colley*, 784 F.2d at 990. All of the admitted statements were highly relevant, and not arbitrary, as they pertained to the relationship between Petitioner and the victim and helped to provide insights into the victim's state of mind prior to her disappearance. Further, the trial court instructed the jury that it could only consider the hearsay statements as to state of mind, "as tending to prove or explain acts or conduct of the declarant," and for no other purpose. RT 794-95. Ultimately, it cannot be said that the admission of the 15 hearsay statements "rendered the trial ultimately unfair" because the statements themselves constituted a negligible portion of the abundant circumstantial evidence implicating Petitioner in the murder of the victim, based upon which the jury found Petitioner guilty. Moreover, it cannot be said that there were no permissible inferences that the jury could draw from the evidence such that its admission violated due process. *See Jammal*, 926 F.2d at 920.

Petitioner is not entitled to federal habeas relief on his claim he was deprived of the right to due process and the right to a fair trial because the trial court improperly admitted these hearsay statements of the victim because the California Court of Appeal's rejection of the claim was not contrary to, or involved an unreasonable determination of, clearly established Supreme Court precedent, or involved an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

### 2.       Confrontation Clause

Petitioner does not explain how he contends the admission of these hearsay statements violated his Sixth Amendment rights under the Confrontation Clause. Although the victim's disclosures to her friends constitute "out of court statements," they were not offered or admitted to prove the truth of the matter asserted, but instead as evidence of her state of mind. *See Anderson*, 417 U.S. at 211. Moreover, as mentioned above, the trial court expressly instructed the jury that it could only consider the hearsay statements as to state of mind, "as tending to prove or explain acts or conduct of the declarant," and for no other purpose. RT 794-95. Accordingly, the Confrontation Clause is not implicated by their admission.

Even if the hearsay statements in question gave rise to a potential violation of the Confrontation Clause, Petitioner's claim would still fail because such claims are subject to harmless error analysis. *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004); *see also United States v. Allen*, 425 F.3d 1231,1235 (9th Cir. 2005). For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial effect upon the jury. *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht*, 507 U.S. at 637); *Webb v. Lewis*, 44 F.3d 1387, 1393 (same). In light of the abundant evidence implicating Petitioner in the victim's murder, as discussed above, the admission of these statements cannot be considered prejudicial.

Petitioner is not entitled to federal habeas relief on his claim he was deprived of his Sixth Amendment right to confrontation because the trial court improperly admitted the hearsay statements attributed to the victim because the California Court of Appeal's rejection of the claim was not contrary to, or involved an unreasonable determination of, clearly established Supreme Court precedent, or involved an

34

1   unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d).

2   **V.   Failure to Give Instruction on Involuntary Manslaughter**

3   Petitioner claims that the trial court violated his due process rights when it

4   failed to instruct the jury on the lesser offense of involuntary manslaughter.  At trial,

5   Petitioner's counsel expressly declined to argue for an instruction on involuntary

6   manslaughter because he didn't "see any facts or inference from proven facts that

7   would support the giving of the involuntary manslaughter [instruction]."  RT 2528.

8   The court agreed that "it seemed that involuntary manslaughter would not fit the

9   facts as they've come out in this case."  *Id.* at 2542.  Nonetheless, Petitioner brought

10   a claim to the state appellate court that the trial court should have given an

11   instruction on involuntary manslaughter.  The California Court of Appeal rejected

12   Petitioner's claim as follows:

13   [T]here was no evidence that defendant merely brandished the
     knife, as opposed to consciously employing it as a weapon.  The
14   prosecution did present evidence of the latter (i.e., testimony that
     around the victim's left eye were marks that could have been caused by
15   the knife found in defendant's closet), but defendant presented no
     evidence of the former.  The only evidence explaining his version of
16   the victim's last day was the statement he gave to police on November
     11.  At best it shows that that he and Ms. Emery had an argument that
17   involved yelling only, with no physical violence, and no mention of a
     knife, and that it ended with sufficient lack of ill-feeling that the two
18   had sex.  As for the "physical fight" defendant mentions, he is
     referring to Riedl's hearsay testimony regarding the hysterical
19   telephone call he received from the victim weeks before her
     disappearance, and it did not involve a knife.  Based upon strong
20   evidence of the brutality and thoroughness of Ms. Emery's killing (cut
     marks in the area of the eyes, a broken jaw, four broken ribs, fractures
21   of both hips, the sacrum, and left femur), the jury found defendant
     guilty of murder.  Under these circumstances, and considering that the
22   jury rejected voluntary manslaughter, there was no error in failing to
     instruct on involuntary manslaughter. (*People v. Mendoza*, supra, 24
23   Cal.4th 130, 174, 99 Cal.Rptr.2d 485, 6 P.3d 150; *People v.
     Breverman*, supra, 19 Cal.4th 142, 162, 77 Cal.Rptr.2d 870, 960 P.2d
24   1094.)

25   *Johnson*, 2003 WL 21224035, at 16.

26   Petitioner here argues that the appellate court was wrong to reject his claim,

27

28                                             35

because the evidence of the "brutality and thoroughness" of the victim's killing does not "inform . . . with respect to the state of mind of the perpetrator." Pet. at 18. Petitioner asserts that the cut marks found on the victim could be the product of criminal negligence, or could have been inflicted during the commission of an ordinarily lawful act involving a high degree of risk of death or great bodily harm, which would support a jury instruction on involuntary manslaughter.

### A.     Legal Standard

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceedings. *See Dunckhurst v. Deeds,* 859 F.2d 110, 114 (9th Cir. 1988). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. *See id.* Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury. *See Duckett*, 67 F.3d at 745. After all, due process does not require that an instruction be given unless the evidence supports it. *See Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005); *Miller v. Stagner*, 757 F.2d 988, 993 (9th Cir.), *amended*, 768 F.2d 1090 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048 (1986).

An examination of the record is required to see precisely what was given and what was refused and whether the given instructions adequately embodied the defendant's theory. *See United States v. Tsinnijinnie*, 601 F.2d 1035, 1040 (9th Cir. 1979), *cert. denied*, 445 U.S. 966 (1980). In other words, it allows a determination of whether what was given was so prejudicial as to infect the entire trial and so deny due process. *See id.*

The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *See Walker v. Endell,* 850 F.2d at 475-76 (citing *Henderson v. Kibbe*, 431 U.S. at 155). Thus, a habeas petitioner whose claim involves a failure

36

to give a particular instruction bears an "'especially heavy burden.'"  *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)).  The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given.  *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (quoting *Henderson*, 431 U.S. at 156); *see id.* at 972 (due process violation found in capital case where petitioner demonstrated that application of the wrong statute at his sentencing infected the proceeding with the jury's potential confusion regarding its discretion to impose a life or death sentence).

It is well established that a criminal defendant is entitled to adequate instructions on the defense theory of the case.  *See Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (error to deny defendant's request for instruction on simple kidnaping where such instruction was supported by the evidence).  Failure to instruct on the theory of defense violates due process if "'the theory is legally sound and evidence in the case makes it applicable.'"  *Clark v. Brown*, 450 F.3d 898, 904-05 (9th Cir.2006) (quoting *Beardslee*, 358 F.3d at 577).  However, the defendant is not entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory, *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996); *Tsinnijinnie,* 601 F.2d at 1040, nor to an instruction embodying the defense theory if the evidence does not support it, *Menendez*, 422 F.3d at 1029.

The failure to instruct on a lesser-included offense in a capital case is constitutional error if there was evidence to support the instruction.  *See Beck v. Alabama*, 447 U.S. 625, 638 (1980); *Turner v. Marshall*, 63 F.3d 807, 818 (9th Cir. 1995), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir.

1999) (en banc).[5]  But the failure of a state trial court to instruct on lesser-included offenses in a non-capital case does not present a federal constitutional claim.  *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *Windham v. Merkle*, 163 F.3d 1092, 1105-06 (9th Cir. 1998); *Turner*, 63 F.3d at 819 (citing *Bashor v. Riley*, 730 F.2d 1228, 1240 (9th Cir.), *cert. denied*, 469 U.S. 838 (1984)); *cf. Vickers v. Ricketts*, 798 F.2d 369, 371 (9th Cir. 1986) (where evidence supports lesser-included-offense instruction in capital case, due process requires that court give instruction sua sponte), *cert. denied*, 479 U.S. 1054 (1987).  However, "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the general rule."  *Solis*, 219 F.3d at 929 (citing *Bashor v. Risley*, 730 F.2d at 1240).  *Solis* suggests that there must be substantial evidence to warrant the instruction on the lesser included offense.  *See Solis*, 219 F.3d 929-30 (no duty to instruct on voluntary manslaughter as lesser included offense to murder because evidence presented at trial precluded a heat of passion or imperfect self-defense instruction; no duty to instruct on involuntary manslaughter because evidence presented at trial implied malice); *see also Cooper v. Calderon*, 255 F.3d 1104, 1110-11 (9th Cir. 2001) (no duty in death penalty case to instruct on second degree murder as a lesser included offense because the evidence established that the killer had acted with premeditation, so if the jury found that the defendant was the killer, it necessarily would have found that he committed first degree murder).

## B.    Analysis

The California Court of Appeal's rejection of Petitioner's claim that the trial

---

[5]It appears that *Beck* may not even apply to capital cases in California because California, unlike the State of Alabama in *Beck*, has not "'erected an artificial barrier that restrict[s] its juries to a choice between conviction for a capital offense and acquittal.'" *Anderson v. Calderon*, 232 F.3d 1053, 1082 (9th Cir. 2000) (quoting *Hopkins v. Reeves*, 524 U.S. 88, 96 (1998)).

court violated his due process rights when it failed to instruct the jury on the lesser offense of involuntary manslaughter was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d). The failure of a state trial court to instruct on lesser-included offenses in a non-capital case, such as the case here, does not present a federal constitutional claim, except when there is substantial evidence to warrant the instruction on the lesser included offense. *See Solis,* 219 F.3d at 929. In the instant case, the "lesser included offense" is involuntary manslaughter, which is the unlawful killing of a human being "without malice aforethought . . . without an intent to kill, and without conscious disregard for human life." CALJIC No. 8.45.

Petitioner does not identify nor does the court find substantial evidence which would support the court's issuance of an instruction on involuntary manslaughter. To the contrary, the appellate court noted there was significant evidence presented at trial indicating that Petitioner acted with malice aforethought, and that he harbored an intent to kill and no evidence of a version of events consistent with involuntary manslaughter. Accordingly, the trial court's failure to instruct on involuntary manslaughter cannot be said to violate Petitioner's due process rights. *See Clark*, 450 F.3d at 904-05 (quoting *Beardslee*, 358 F.3d at 577).

Petitioner is not entitled to federal habeas relief on his claim that the trial court violated his due process rights when it failed to instruct the jury on the lesser offense of involuntary manslaughter because the California Court of Appeal's rejection of the claim was not contrary to, or involved an unreasonable determination of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d).

**VI.   Evidence of Prior Domestic Violence**

Petitioner claims that the trial court violated his due process rights when it allowed the prosecution to introduce evidence regarding past incidents of domestic

violence under Cal. Evid. Code § 1109.  Cal. Evid. Code § 1109 provides, in relevant part that, "except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."  Cal. Evid. Code § 1109.  Cal. Evid. Code § 1101 stands generally for the principle that "[e]vidence of a person's character . . . is inadmissible when offered to prove his or her conduct on a specified occasion."  Cal. Evid. Code § 1101.  Cal. Evid. Code § 352 permits courts, in their discretion, to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  Cal. Evid. Code § 352.

Petitioner filed several motions in limine to exclude or limit the testimony of several witnesses whom might have been anticipated to testify on incidents of prior domestic violence committed by Petitioner.  These witnesses included Eva Jean, Isabel Perry, Karen Emery, and Thomas Riedl.[6]  The Court denied Petitioner's motions to exclude the testimony of these witnesses.  On appeal, the California Court of Appeal rejected this claim, explaining:

> This court rejected an identical due process claim in *People v. Escobar, supra*, 82 Cal.App.4th 1085, 98 Cal.Rptr.2d 696, and we see no reason to revisit that conclusion.
>
> The equal protection argument was rejected in *People v. Jennings* (2000) 81 Cal.App.4th 1301, 97 Cal.Rptr.2d 727, wherein Division Three of this District stated: "domestic violence is quintessentially a secretive offense, shrouded in private shame, embarrassment and ambivalence on the part of the victim, as well as intimacy with and intimidation by the perpetrator. The special relationship between victim and perpetrator in both domestic violence and sexual abuse cases, with their unusually private and intimate

---

[6]See Section IV above for a complete description of the testimony of these trial witnesses.

40

context, easily distinguishes these offenses from the broad variety of criminal conduct in general. Although all criminal trials are credibility contests to some extent, this is unusually-even inevitably-so in domestic and sexual abuse cases, specifically with respect to the issue of victim credibility. The Legislature could rationally distinguish between these two kinds of cases and all other criminal offenses in permitting the admissibility of previous like offenses in order to assist in more realistically adjudging the unavoidable credibility contest between accuser and accused. The fact that other crimes such as murder and mayhem may be more serious and that credibility contests are not confined to domestic violence cases do not demonstrate the absence of the required rational basis for the Legislature's distinction between these crimes." (*Id.* at p. 1313, 97 Cal.Rptr.2d 727.) We agree with this analysis.

*Johnson*, 2003 WL 21224035, at 16.  Petitioner now argues that Cal. Evid. Code § 1109 is unconstitutional, and that it "violates equal protection of the laws."  Pet. at 24.

### A.      Legal Standard

Permitting a jury to hear evidence of prior crimes or bad acts may violate due process.  *See Marshall v. Lonberger*, 459 U.S. 422, 438-39 n.6 (1983); *Fritchie v. McCarthy*, 664 F.2d 208, 212 (9th Cir. 1981) (citing *Spencer v. Texas*, 385 U.S. 554, 561 (1967)).  A state court's procedural or evidentiary ruling is not subject to federal habeas review, however, unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.  *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991).  Accordingly, a federal court cannot disturb on due process grounds a state court's decision to admit evidence of prior crimes or bad acts unless the admission of the evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  *See Walters*, 45 F.3d at 1357; *Colley* 784 F.2d  990.

The admission of other crimes evidence violates due process where there are no permissible inferences the jury can draw from the evidence (in other words, no inference other than conduct in conformity therewith).  *See McKinney v. Rees*, 993

41

F.2d 1378, 1384 (9th Cir. 1993); *Jammal*, 926 F.2d at 920.  But it is generally upheld where: (1) there is sufficient proof that the defendant committed the prior act; (2) the prior act is not too remote in time; (3) the prior act is similar (if admitted to show intent); (4) the prior act is used to prove a material element; and (5) the probative value of admitting evidence of the prior act is not substantially outweighed by any prejudice the defendant may suffer as a result of its admission.  *See McDowell v. Calderon*, 107 F.3d 1351, 1366 (9th Cir.) (sentencer may rely on prior criminal conduct not resulting in a conviction if the evidence has "some minimal indicium of reliability beyond mere allegation"), amended, 116 F.3d 364 (9th Cir. 1997), vacated in part by 130 F.3d 833, 835 (9th Cir. 1997) (en banc); *Walters*, 45 F.3d at 1357-58 (upholding state admission of prior on federal habeas review); *Sanders v. Housewright*, 603 F. Supp. 1257, 1259 (D. Nev. 1985) (same), aff'd, 796 F.2d 479 (9th Cir. 1986); *see also United States v. Sneezer*, 983 F.2d 920, 924 (9th Cir. 1992) (upholding admission of prior on direct review on similar grounds), cert. denied, 510 U.S. 836 (1993).  *But cf. Garceau v. Woodford*, 275 F.3d 769, 775-76 (9th Cir. 2001) (instruction permitting jury to consider priors for purposes of establishing propensity violates due process when balance of prosecution's case is not strong, other crime is same crime for which defendant is on trial, and evidence of prior is emotionally charged), overruled on other grounds by 538 U.S. 202 (2003).

A statute or rule of evidence allowing admission of evidence of prior crimes to show a propensity to commit the charged offense does not facially violate due process if the evidence to be admitted is subject to a balancing test by the trial court. *See United States v. LeMay*, 260 F.3d 1018, 1031 (9th Cir. 2001) (new federal rules of evidence allowing evidence of prior sexual offenses to show a propensity to commit the charged offense do not violate due process because evidence is still subject to trial court balancing test which provides for meaningful appellate review).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### B.  Analysis

The California Court of Appeal's rejection of Petitioner's claim that the trial court violated his due process rights when it allowed the prosecution to introduce evidence regarding past incidents of domestic violence under Cal. Evid. Code § 1109, was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.  See 28 U.S.C. § 2254(d).

The trial court's decision to admit evidence of prior crimes of domestic violence was not  arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *See Walters*, 45 F.3d at 1357; *Colley* 784 F.2d at 990.  To the contrary, the prosecution argued that  the incident of domestic violence to which Ms. Jean was to testify was not remote in time (it occurred within the same year as the murder of the victim), and it was probative of defendant's propensity for violence. RT 45.  In the case of Ms. Perry, the prosecution argued, again, that the incident to which she was going to testify spoke, in part, to Petitioner's intent. RT 49.  The prosecution also stressed the probative value surrounding the testimony of Ms. Emery, the victim's mother,  and Mr. Riedl, particularly as it pertained to Petitioner's harassing behavior towards the victim, and her fear of him. RT 58-59.   In each case, the trial court judge denied Petitioner's motion to exclude limited evidence in limine.  In each case there was sufficient proof that Petitioner committed the prior act, which was not too remote in time, involved domestic violence against the victim (as admitted to show intent), was used to prove a material element (intent), and of marked probative value as compared to any potential for prejudice.  *See McDowell*, 107 F.3d at 1366.  Petitioner here fails to show how the trial court's decision amounts to an error that might give rise to a constitutional violation.

Petitioner is not entitled to federal habeas relief on his claim that the trial court violated his due process rights when it allowed the prosecution to introduce evidence

43

regarding past incidents of domestic violence under Cal. Evid. Code § 1109 because the California Court of Appeal's rejection of the claim was not contrary to, or involved an unreasonable determination of, clearly established Supreme Court precedent, or involved an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d).

**VII.   Jury Instructions Misstated Burden of Proof Necessary for Conviction**

Petitioner claims that the trial court's instruction to the jury on CALJIC Nos. 2.50.02, 2.50.1, and 2.50.2 deprived him of due process by misstating the burden of proof necessary for conviction.   The California Court of Appeal provided the following background for Petitioner's claim:

> The trial court instructed the jury with the version of CALJIC No. 2.50.02 amended in 1999. As relevant here the jury was instructed: "Evidence has been introduced for the purpose of showing that the defendant engaged in an offense involving domestic violence on one or more cases other than that charged in this case....

> If you find that the defendant committed a prior offense involving domestic violence, you may, but are not required to, infer that the defendant had a disposition to commit offenses involving domestic violence.

> If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime of which he is accused.

> However, if you find by a preponderance of the evidence that the defendant committed a prior crime, or crimes involving domestic violence, that is not sufficient by itself ... to prove beyond a reasonable doubt, that he committed the charged offense. The weight and significance, if any, are for you to decide. You must not consider this evidence for any other purpose."

> The jury was then instructed with CALJIC Nos. 2.50.1 and 2.50.2 as follows: "Within the meaning of the preceding instruction, the prosecution has the burden of proving, by a preponderance of the evidence, that a defendant committed crimes other than that for which he is on trial. You must not consider this evidence for any purpose unless you find by a preponderance of the evidence that a defendant committed the other crimes.

> Preponderance of the evidence means evidence that has more convincing force than that opposed to it. If the evidence is so evenly

44

balanced that you are unable to find that the evidence on either side of an issue preponderates, your finding on that issue must be against the party who had the burden of proving it."

Defendant contends that these instructions "deprived him of due process by misstating the burden of proof necessary for conviction." Defendant perceives the likelihood that the jury could find by a preponderance of the evidence that he committed prior acts of domestic violence, and from that draw "the improper inference of guilt from propensity," thereby impermissibly diluting the requirement of proof beyond a reasonable doubt. In making this argument defendant lays particular stress on the "and did commit" language in CALJIC No. 2.50.02.

*Johnson*, 2003 WL 21224035, at 16-17.

The court rejected Petitioner's claim, noting that the "essence" of his reasoning "was rejected by Division Two of this Court in *People v. Brown* (2000) 77 Cal.App.4th 1324, 92 Cal.Rptr.2d 433, which relied in large part on the Supreme Court's decision in *People v. Falsetta* (1999) 21 Cal.4th 903, 89 Cal.Rptr.2d 847, 986 P.2d 182. We find the logic of *Brown* persuasive." *Id*. at 17.

In *Brown*, the court found that CALJIC No. 2.50.02 expressly prohibited the jury from inferring that the defendant committed the charged offense based solely on proof of prior acts of domestic violence. *Id*. citing *Brown*, 77 Cal. App. 4th at 92. The court further found that the review of the record revealed "a consistent message from the instructions as a whole and from the closing arguments . . . that the jury must find Brown guilty beyond a reasonable doubt before it could convict him of any of the charged offenses," and concluded that there was no reasonable likelihood that the jury believed it could convict on a standard less than beyond a reasonable doubt. *Id*.

In *Falsetta*, and its progeny, including *People v. Reliford* 29 Cal.4th 1007 (2003), the Supreme Court of California addressed CALJIC No. 2.50.01, "which is similar to CALJIC No. 2.50.02, except that it deals with evidence of prior sexual offenses admitted pursuant to Evidence Code section 1108." *Id*. at 17.  Where the

defendant in those cases essentially put forth the same argument as the defendant in *Brown*, and the court again found that there was no reasonable likelihood that the jury believed it could convict on a standard less than beyond a reasonable doubt. *Id.*

Based on the "logic of *Brown* and *Reliford*," the California Court of Appeal concluded that Petitioner's claim "must be rejected." *Id.* at 18.  The court found that the factual circumstances of the instant case were the same as in *Brown*, and that Petitioner was unable "to point to proof in the record that other instructions or argument from counsel which suggested a lowering of the prosecution's burden of proof." *Id.*

Petitioner here challenges the appellate court's conclusion that there was no reasonable likelihood that the jury applied a standard below reasonable doubt.  He reiterates his position that CALJIC Nos. 2.50.02, 2.50.1, and 2.50.2 misstate the way in which a jury may treat propensity evidence, "in a manner that undermines the presumption of innocence and the reasonable doubt standard" and which is "constitutionally infirm."  Pet. at 27.

**A.     Legal Standard**

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle*, 502 U.S. at 72; *Cupp*, 414 U.S. at 147; *see also Donnelly*, 416 U.S. at 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").

The Due Process Clause of the Fourteenth Amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he or she is charged. *In re Winship*, 397 U.S. 358, 364 (1970).  This constitutional principle prohibits the State from using

evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime. *See Yates v. Evatt*, 500 U.S. 391, 400-03 (1991); *Carella v. California*, 491 U.S. 263, 265-66 (1989); *Francis v. Franklin*, 471 U.S. 307, 313 (1985); *Sandstrom v. Montana*, 442 U.S. 510, 520-24 (1979). Failure to properly instruct the jury on the necessity of proof beyond a reasonable doubt "can never be harmless error." *Gibson v. Ortiz*, 387 F.3d 812, 825 (9th Cir. 2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 320 n.14 (1979)). "When a court gives the jury instructions that allow it to convict on an impermissible legal theory, as well as a theory that meets constitutional requirements, 'the unconstitutionality of any of the theories requires that the conviction be set aside.'" Id. (citing *Boyde v. California*, 494 U.S. 370, 379-80 (1990)).

When confronted with an ambiguous instruction, the inquiry is whether there is a "reasonable likelihood" that the jury has applied it in an unconstitutional manner. *See Estelle*, 502 U.S. at 72 n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990). Such an unconstitutional application must also have a substantial and injurious effect or influence in determining the jury's verdict, *see Brecht*, 507 U.S. at 637, to warrant relief in habeas proceedings. *See Calderon v. Coleman*, 525 U.S. 141, 146-47 (1998).

The Ninth Circuit found the 1996 version of CALJIC 2.50.01 to be facially erroneous as to the burden of proof in *Gibson*, 387 F.3d at 821-22. That version read,

> If you find that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant had a disposition to commit the same or similar type sexual offenses. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime or crimes of which he is accused.

*Id.* at 822. The trial court immediately followed with CALJIC 2.50.1:

47

> Within the meaning of the preceding instructions the prosecution has the burden of proving by a preponderance of the evidence that a defendant committed sexual offenses and/or domestic violence other than those for which he is on trial.

*Id*. The *Gibson* court found that the trial court's use of this version of CALJIC 2.50.01, combined with CALJIC 2.50.1, violated due process by allowing the "jury to find the [petitioner] committed the uncharged sexual offenses by a preponderance of the evidence and thus infer that he had committed the charged acts based upon facts found not beyond a reasonable doubt, but by a preponderance of the evidence." *Id*. at 821-23. The *Gibson* court specified that it found no errors in the remainder CALJIC 2.50.01. *See id.*

### B.    Analysis

The California Court of Appeal's rejection of Petitioner's claim that the trial court violated his due process rights by misstating the burden of proof necessary for conviction was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

The versions of CALJIC Nos. 2.50.02, 2.50.1, and 2.50.2 at issue in this case are neither facially erroneous nor ambiguous with regard to the standard of proof. *Gibson* serves as an analogous case, as the language of CALJIC Nos. 2.50.01 and 2.50.02 parallel each other.[7]   The *Gibson* court found that the 1996 version of CALJIC 2.50.01 coupled with 2.50.1 violated due process by allowing jurors to infer guilt based on evidence of prior sex offenses proved not beyond a reasonable doubt, but by the lower "preponderance of the evidence" standard. *Id*. at 821-23.   Here, however, the versions of CALJIC Nos. 2.50.1 and 2.50.2 that were given explicitly prohibit a lesser, or preponderance of evidence, standard. *See Estelle*, 502 U.S. at

---

[7]Whereas CALJIC No. 2.50.1 governs the treatment prior sex offenses, CALJIC No. 2.50.2 deals with evidence of prior incidents of domestic violence.

48

72.  As noted above, the version of CALJIC No. 2.50.2 used by the trial court expressly proscribed the jury from inferring Petitioner's guilt based solely on prior incidents, as doing so would have been an insufficient basis for proving the instant crime beyond a reasonable doubt. *See Johnson*, 2003 WL 21224035, at 17.

Even if the instructions here were ambiguous, there is no "reasonable likelihood" that the jury applied it in an unconstitutional manner.  *See Estelle*, 502 U.S. at 72 & n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990); *see, e.g., Ficklin v. Hatcher*, 177 F.3d 1147, 1150-51 (9th Cir. 1999) ("harmless error" when certain that jury did not rely on constitutionally infirm instruction).

Assuming the jury did improperly apply the version of the instruction here due to ambiguity, it would not be a structural error as in *Gibson*, in which the court refused to extend harmless error analysis to facially invalid jury instructions.  387 F.3d at 825.  Instead, the inquiry would be whether the error had a substantial and injurious effect on the guilty verdict and whether the verdict would stand absent the erroneously admitted evidence.  *See Brecht*, 507 U.S. at 638 (citing *Kotteakos*, 328 U.S. at 764-65).  However, the errant application of an ambiguous instruction regarding the evidence of prior domestic offenses would not have had such an effect. Petitioner faced overwhelmingly inculpatory evidence at trial that established his guilt beyond a reasonable doubt.  The jury could have reasonably determined Petitioner's guilt on this basis alone.  Accordingly, this Court finds no due process violation and rejects this claim on the merits.

Petitioner is not entitled to federal habeas relief on his claim that the trial court violated his due process rights by misstating the burden of proof necessary for conviction because the California Court of Appeal's rejection of the claim was not contrary to, or involved an unreasonable determination of, clearly established Supreme Court precedent.  *See* 28 U.S.C. § 2254(d).

49

1

**CONCLUSION**

2          After a careful review of the record and pertinent law, the petition for writ

3   of habeas corpus is DENIED.  The Clerk shall enter judgment in favor of

4   Respondent and close the file.

5          IT IS SO ORDERED.

6   Dated: October 24, 2007

7                                                    _____
                                                     JEFFREY S. WHITE
8                                                    United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                                  50

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

JOHNSON,

                Plaintiff,

   v.

CAMPBELL et al,

                Defendant.

_____/

Case Number: CV04-05169 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on October 24, 2007, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Joan Killeen
Office of the Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102

Larry M. Johnson C-77494
CTF - Correctional Training Facility
P. O Box 689
Soldad, Ca 93960-0689

Dated: October 24, 2007

*Jennifer Ottolini*

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk